Azar Mouzari, SBN 263461
Nilofar Nouri, SBN 311871
**BEVERLY HILLS TRIAL ATTORNEYS, P.C.**
9350 Wilshire Blvd., Suite 203
Beverly Hills, California 90212
Tel:  310-858-5567  Fax: 310-627-8642
Email: azar@bhtrialattorneys.com
Email: nilofar@bhtrialattorneys.com

Attorneys for Plaintiffs and the Class

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REESE TURBIN, an individual, JENNIFER L. BROOKMAN, an individual, CHRISTI CLINGAN, an individual, JARED S. GILFORD, an individual, ERICA REESE, an individual, MAURICIO SERRANO, an individual, MICHAEL SEYBERT, an individual, and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>THUMBTACK, INC., a Delaware Corporation, and DOES 1 through 10 inclusive,<br><br>        Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>**(1) FRAUDULENT CONCEALMENT AND MISREPRESENTATION**<br>**(2) VIOLATION OF THE BUSINESS & PROFESSIONS CODE SECTIONS 17200 ET SEQ. ("UCL")**<br>**(3) UNJUST ENRICHMENT**<br>**(4) VIOLATION OF FALSE ADVERTISING LAW, CAL. BUS. & PROF. CODE § 17500**<br>**(5) BREACH OF IMPLIED CONTRACT**<br>**(6) VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT (CLRA)** |

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS…………………………………………………..........…..…2

INTRODUCTION……………………………………………………..…....…3

PARTIES………………………………………………………………….......4

      I.    Plaintiffs…………………………………………...…4

      II.   Defendants……………………………………….……5

JURISDICTION AND VENUE…………………………………...…………5

GENERAL ALLEGATIONS………………………………….…..…..………6

CLASS ACTION ALLEGATIONS………………………....…………9

CAUSES OF ACTION……………………………………...………..13

PRAYER FOR RELIEF……………………………………..…………23

JURY TRIAL DEMAND………………………………………..…24

COME NOW Plaintiffs REESE TURBIN, an individual, JENNIFER L. BROOKMAN, an individual, CHRISTI CLINGAN, an individual, JARED S. GILFORD, an individual, ERICA REESE, an individual, MAURICIO SERRANO, an individual, MICHAEL SEYBERT, an individual, and all others similarly situated (collectively "Plaintiffs"), and through their counsel of record, Beverly Hills Trial Attorneys, P.C., file this class action complaint against THUMBTACK, INC. ("Thumbtack"), and DOES 1 through 10, inclusive (collectively "Defendants"), seeking damages and relief on behalf of themselves and for all others similarly situated for: fraudulent concealment and misrepresentation, violation of California's Unfair Competition Law - *Business & Professions Code* sections 17200, *et seq*. ("UCL"), unjust enrichment, Violation of False Advertising Law, Unjust Enrichment, Violation of the Consumer Legal Remedies Act, and related claims as stated herein as below. Unless explicitly stated to the contrary, all allegations are based upon information and belief.

## INTRODUCTION

1.    Defendant Thumbtack, Inc. is a dishonest enterprise that has turned a lead generation business into a vehicle for greed and abuse.  Thumbtack, Inc. was founded in 2008, and is a lead generation platform whereby through its website, it connects users with various service professionals ("Pros") offering various services, and is therefore, supposed to help businesses find costumers and get more leads.

2.    Whereas the service is free to homeowners, revenue is generated primarily from the fees paid by Pros for customer service requests ("Leads").  On its face, such a matching service seems innocuous enough, but this business model was devised for wrongful, unlawful conduct in furtherance of systemically flawed and deficient processes used to generate illicit revenue from Pros.

3.    In contrast to fixed-cost membership platforms, like many such as Angie's List, where the customer pays a fee to have access to a directory of screened and customer-reviewed contractors to use for search and selection purposes, Thumbtack's business model turns such conventional behavior upside down by charging Pros the cost of each supposed "qualified" customer Lead.  This is a far more profitable model than that which is used by Angie's List because Thumbtack's potential revenue is essentially limitless, as it is predicated on the Lead pipeline that can be filled with bogus Leads.

4.    Thumbtack's business model has changed several times since its inception. As it operates now, while listing a business and services is free, collecting Leads through the platform will cost Pros fees for receiving those Leads. Every Lead provided to a Pro has a monetary value, however, there is no way for a Pro to know how much a Lead cost is until after being provided the Lead and charged the premium.

5.    Thumbtack claims that the pricing for each lead will vary based on factors such as region, industry, job type, job size and job competition. However, given the lack of transparency, Pros are unable to get a true sense of the costs involved with using Defendant Thumbtack's services.

6.    While Thumbtack's robust sales force, omitting information about the true nature of the Leads, and using false promises of success and misrepresentations, can fulfill the demand by aggressively adding Pros to the Thumbtack network, it is the supply-side, the customer Leads, that Thumbtack has less ability to control.  Specifically, Thumbtack vigorously supplements the Lead pipeline by means that  are  inherently incapable of generating real, genuine leads for Pros, and on information and belief, with information acquired through lead generating companies.

7.    Significantly, Thumbtack does not subject any Leads, to any meaningful check, filter or verification to assure any semblance of validity. It does not actively monitor the manner in which third-parties gather "lead" information.  Nor does Thumbtack require or use itself any methods in an effort to eliminate non-human, robot traffic from generating "leads."

8.     Through  fraudulent  business  practices,  Thumbtack's  revenues  have  soared. Thumbtack's wrongful, unlawful conduct as alleged herein consists of: fraud and misstatements about the true nature of its service; charging Pros for bogus Leads; charging Pros for unauthorized Leads; and unlawful and unconscionable dealings with Pros throughout and subsequent to their relationship with Thumbtack.

## **PARTIES**

## **PLAINTIFFS**

9.    Plaintiff Reese Turbin is, and at all times relevant here, has been a citizen of the state of Illinois.

10.    Plaintiff Jennifer L. Brookman is, and at all times relevant here, has been a citizen of the state of Tennessee.

11.    Plaintiff Christi Clingan is, and at all times relevant here, has been a citizen of the state of Texas.

12.    Plaintiff Jared S. Gilford is, and at all times relevant here, has been a citizen of the state of California.

13.    Plaintiff Erica Reese is, and at all times relevant here, has been a citizen of the state of Colorado.

14.    Plaintiff Mauricio Serrano is, and at all times relevant here, has been a citizen of the state of California.

15.    Plaintiff Michael Seybert is, and at all times relevant here, has been a citizen of the state of California.

**DEFENDANTS**

16.    Defendant is organized and incorporated under the laws of Delaware and maintains its corporate headquarters and principal place of business in San Francisco, California.

17.    Plaintiffs are unaware of the true names and capacities of defendants sued herein as DOES 1 through 10, inclusive, and therefor sue those defendants by those fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and on that ground alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences alleged and that Plaintiffs' injuries and damages, as alleged, are proximately caused by those occurrences.

18.    At all relevant times, Defendants and each of them, inclusive, expected or should have expected that their acts would have consequences within the United States of America including the State of California, as said Defendant derived and derive substantial revenue therefrom.

**JURISDICTION AND VENUE**

19.    This Court has original jurisdiction of this Action pursuant to the Class Action Fairness Act, 28 United States Code § 1332(d)(2)(A).  The matter in controversy, exclusive of interest, costs and fees, exceeds the sum or value of $5,000,000, and is a class action in which at least one of the members of the proposed Class has a different citizenship from Defendant.

20.    The Court has personal jurisdiction over Defendant Thumbtack because this Defendant is a Delaware Corporation with its principal place of business in San Francisco County, California. Additionally, the Court has personal jurisdiction over Defendant Thumbtack because

it maintains and carries on systematic and continuous contacts in the State of California, and conducts business within the State of California, and/or otherwise intentionally avails itself of the California market through its promotion, sales, distribution and marketing within the State to render the exercise of jurisdiction by this Court permissible.

21.     Venue is proper in this Court because Defendant's principal place of business is situated in San Francisco County, State of California, and substantial parts of the events giving rise to at least one Plaintiff's claims occurred in this judicial district.

<u>**GENERAL ALLEGATIONS**</u>

22.     Thumbtack flipped the transparent, fixed-cost membership model, like Angie's List, on its head by operating a two-sided home services marketplace, where both consumers and high-quality service professionals come to be matched to one another.  By relieving the customers of any financial obligation for using the service and placing Thumbtack in the role as the conduit between the homeowner and Pros, the quality and veracity of the Leads Thumbtack sells to Pros are imperative.

23.     Thumbtack automatically charges Pros from a few dollars to hundreds of dollars per Lead, depending on the type of service requested, the location of the request, the project size and the number of Pros available. It is therefore critical that the Leads are, as Thumbtack represents, from serious, project-ready customers, that the information reflected in the Lead is accurate, that the Leads are targeted to the services performed by the Pros and within the Pros geographic reach, and that the Leads are sent to a limited number of Pros.

24.     However, Thumbtack conceals the true nature and genesis of its Leads and, during  all relevant times,  has misrepresented that bad Leads  are  weeded out from serious, qualified and project-ready customers, thereby assuring the quality of the Leads sold to the Pros. In fact, Thumbtack engages in a pattern of misrepresentations and omissions regarding the quality and nature of its Leads.

25.     In    fact, throughout the class period, Thumbtack has misrepresented the Leads and made misrepresentations as follows:

- "We limit competition for each job among pros."[1]

- "We match you with jobs that exactly fit your preference." *Id.*

- "You get conversations with real customers. Not just views." *Id.*

- "We'll send you direct leads (leads that match your targeting preferences) and you

---

[1] https://www.thumbtack.com/pro (last accessed April 16, 2025),

seal the deal with the customer. Because these leads match your preferences, you pay for them automatically."[2]

- "Direct leads - These leads perfectly match your targeting preferences. They come from customers who searched for a pro, saw your profile, and reached out to you."[3]

26.    The "Leads", however, are bogus for several reasons.    The Leads originate from sources that are neither reliable nor capable of generating the kinds of Leads that Thumbtack markets and sells.  Furthermore, Thumbtack acquires, generates and charges Plaintiffs and Pros for Leads that are not verified nor are they from targeted, serious, qualified and/or project-ready customers. As such, Pros receive and pay far more than "a nominal fee" for Leads that are essentially worthless, costing their businesses thousands of dollars in loss each year.

27.    The Leads charged to the Pros are the product of Thumbtack's systemically flawed system and process, and are of no value because they are often comprised of:

a.  wrong or disconnected phone numbers;

b.  wrong contact information;

c.  persons who never even heard of Thumbtack;

d.  persons who did not submit a service request and/or are not interested in having the service performed;

e.  Leads that are over distributed;

f.  Leads that are for locations nowhere near the Pro;

g.  contacts for call-centers and/or calls through Google Voice.

28.    Due to Thumbtack's concealment of the materially defective nature and substance of the Leads, and contrary to Thumbtack's representations about the Leads, Plaintiffs and the members of the Nationwide and State Classes (defined below) were and continue to be charged for Leads that do not constitute targeted, serious or qualified Leads, and are not Leads from project-ready customers.

29.    In fact, Leads sold to the Pros were generated through processes that flatly contradict Thumbtack's representations as to the characteristics and nature of the Leads.

---

[2] https://help.thumbtack.com/article/how-thumbtack-works/ (last accessed April 16, 2025).
[3] https://help.thumbtack.com/article/types-of-leads (last accessed April 16, 2025).

30.     On information and belief, Thumbtack utilizes various persons and businesses to accomplish the fraud perpetuated on the Pros, many of which will be identified during discovery in this matter.

31.     Moreover, Thumbtack's Lead generation practices are incapable of Producing targeted, project-ready Leads.  Contrary to its representations to Pros, Thumbtack's internal Lead generation practices cannot produce the quality, project-ready Leads that it promises its Pros.

32.      The Lead submission form found on Thumbtack's website does not deter "price shoppers" and "tire kickers" as it does not even require a customer to sign up for Thumbtack in order to request a business's availability.  In several places, Thumbtack's Lead form provides customers with the impression that they are merely submitting a request for the Pros' availability.

33.     Thumbtack fails to take any steps to discern the level of interest from individuals completing the Lead form creates a disconnect between Thumbtack's representations to Pros that Leads are project-ready. Nor does Thumbtack put customers on notice, who would be hesitant or resist to submitting the Lead form, that each Pro will be charged upon receipt of the customer's information.

34.     Additionally, while Thumbtack represents that Leads are sold to a handful of Pros, many times this is not the case.  In fact, at no point does Thumbtack inform Pros that they will be competing against an unknown network of contractors for jobs from Leads.  To the contrary Thumbtack only tells prospective Pros about its own network, concealing the fact that the Pros will be competing against many other contractors through other networks as well.  In agreeing to sign up for a Pro membership with Thumbtack and purchase Leads, the Pros rely on these representations without being aware of the omitted material facts that they will be effectively competing against many others from other networks.

35.     Thumbtack does not filter, verify or check the quality of the Leads and in fact, its verification and filtering protocol is illusory. Thumbtack's Lead generation efforts are just that – Lead generation, not Lead verification.  It does not validate the accuracy of the address, phone number or customer name associated with a Lead, and makes no effort to verify that the individual identified in the Lead is the customer, that the individual submitted the Lead or is project-ready. Nor does Thumbtack call the alleged customers prior to distributing and charging Pros for Leads.  Rather, its sole objective is to amass Leads to fill the pipeline and sell as many Leads as possible, irrespective of quality.

36.    Thumbtack automatically charges Pros' credit cards and deducts funds from their checking accounts for Leads.   The Pros' ability to know the magnitude of the charges is therefore material.   However, information about the Lead fees is concealed from the Pros and they are misled about Lead fees, which can range from under $10 to hundreds of dollars per Lead.

37.    While the amount that Thumbtack charges per Lead is purportedly determined by the service requested, location, the number of Pros, etc., Thumbtack does not publish nor distribute any Lead fee schedule to Pros.

38.    Thumbtack purposefully conceals material information regarding the huge range in Lead fees to avoid losing potential sales.   On information and belief, sales representatives are told to falsely state to Pros that no Lead fee schedules are available.   On information and belief, Thumbtack has trained its sales representatives to instead offer a Lead fee range or, better yet, an average Lead fee, if pressed, when, they had access to Lead fee schedules.

39.    Thumbtack's wrongful, unlawful conduct of acquiring, selling and charging Pros for memberships and Leads through concealment, fraud and misstatements about the true defective and bogus nature of its business and charging Pros for bogus Leads constitutes fraud and fraudulent concealment supports claims for unjust enrichment and restitution  by  the  Pros, breaches the implied contract between Pros and Thumbtack, and  constitutes  unlawful,  unfair  and fraudulent business acts and practices, and unfair, deceptive, untrue and misleading advertising, by Thumbtack in violation of the state laws.

## CLASS ACTION ALLEGATIONS

40.    As further stated herein as to the following claims, Plaintiffs bring their causes of action on behalf of themselves and all others similarly situated, and certification of this class action is appropriate under California *Code of Civil Procedure* section 382 and California *Civil Code* section 1781, because the questions of law or fact common to the respective Class members predominate over questions of law or fact affecting only individual members.

41.    Plaintiffs seek certification of the following **Nationwide Class**: All persons in the United States who were service professionals ("Pros") on Thumbtack's website and who paid for leads to obtain service requests.

42.    In addition and/or in the alternative, Plaintiffs seek certification of the following State class:

**California Class**: All persons in California who were Pros on Thumbtack's website and who paid for leads to obtain service requests.

**Colorado Class**: All persons in Colorado who were Pros on Thumbtack's website and who paid for leads to obtain service requests.

**Illinois Class**: All persons in Illinois who were Pros on Thumbtack's website and who paid for leads to obtain service requests.

**Tennessee Class**: All persons in Tennessee who were Pros on Thumbtack's website and who paid for leads to obtain service requests.

**Texas Class**: All persons in Texas who were Pros on Thumbtack's website and who paid for leads to obtain service requests.

43.     Excluded from the Class are Defendants' officers, employees, agents or affiliates, and any judge who presides over this action, as well as past and present employees, officers and directors of Defendants. Plaintiffs reserve the right to expand, limit, modify, or amend this Class definition, including the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

**A.     Commonality**

44.     There are questions of law and fact that are common to the claims of Plaintiffs. Among these common questions are the following:

a.      Whether Defendants' representations and/or omissions regarding its services were fraudulent;

b.      Whether Defendants violated California's Unfair Competition Law by misrepresenting material information to its Pros regarding its services;

c.      Whether Defendants violated California's Unfair Competition Law by using uniform, deceptive business practices;

d.      Whether Defendants employed a deceptive course of conduct of charging Pros Leads that were not qualified business opportunities and were not generated by any means to assure they were from serious potential customers;

e.      Whether Defendants concealed and misrepresented to Pros material information about the nature, quality and source of the leads;

f.     Whether Defendants generated or obtained bogus Leads from third parties that were virtually unvetted, and in fact not of the nature and quality expected of the Leads and advertised by Defendants;

g.     Whether Defendants sold bogus Leads to Pros;

h.     Whether Defendants charged Pros for Leads that were not qualified business opportunities;

i.     Whether Defendants charged Pros for Leads that were sent to more than a handful of Pros;

j.     Whether Defendants charged Pros for Leads without their knowledge or consent;

k.     Whether Defendants systematically disregarded the parameters and limits placed by Pros on the type and number of Leads to be charged;

l.     Whether Defendants employed tactics preventing Pros from disputing or receiving meaningful credit or refunds for bogus Leads;

m.     Whether Defendants were unjustly enriched as a result of their conduct;

n.     Whether Class Members have been injured by Defendant's conduct;

o.     Whether, and to what extent, equitable relief and/or other relief should be imposed on Defendants, and, if so, the nature of such relief; and

p.     Whether Defendants' conduct as set forth above injured Plaintiffs and class members, and if so, the extent of the injury and damages

**B.     Numerosity**

q.     The members of the Class are so numerous that separate joinder of each member is impracticable.  Plaintiffs are informed and believe that in the State of California alone, the members of the Class would easily exceed the minimum numbers to satisfy this requirement.

**C.     Typicality**

r. Plaintiffs' claims are typical of the claims of the Class since each of the Plaintiffs was subject to the same or similar practices by Defendants, as was each member of the Class. Plaintiffs and Class members were injured in the same manner by Thumbtack's course of conduct alleged herein.  Plaintiffs and all Class members have the same claims against Thumbtack relating to the conduct alleged herein, and the same events giving rise to Plaintiffs' claims for relief are identical to those giving rise to the claims of all Class Members. Plaintiffs and all Class members sustained monetary and economic injuries arising out of Thumbtack's conduct.

---

*PLAINTIFFS' COMPLAINT*
*[CLASS-ACTION]*

Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class Members.

s. The core issues which predominate over all the other issues in the litigation involve Defendants' unfair, unlawful, negligent and fraudulent practices discussed above.

t. Upon information and belief, there has never been a prior lawsuit certified as a class on behalf of Plaintiffs based on the allegations in this Complaint.

**D.    Adequacy of Representation**

u.   Plaintiffs will fairly and adequately protect the interests of the Class and are committed to the vigorous prosecution of this action. They have retained competent counsel, experienced in litigation of this nature, to represent them and members of the Class.  There is no hostility between Plaintiffs and the unnamed Class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

v. To prosecute this case, Plaintiffs have chosen the law firm of Beverly Hills Trial Attorneys, P.C., whose attorneys have represented plaintiffs in class actions and as private attorneys general in bringing public interest actions.

**E.    Superiority**

w. The questions of law or fact common to the claims of Plaintiffs and of each Class member predominate over any questions of law or fact affecting only individual members of the Class.  All claims by named Plaintiffs and unnamed Class members are based on the same alleged "across the board" representations by Defendants and other acts constituting negligence, unfair competition under the UCL, and fraudulent misrepresentations.

x. Common issues predominate when as here, liability can be determined on a class-wide basis, even when there are some individualized damages. As a result, when determining whether common questions predominate, courts focus on the liability issue and if the liability issue is common to the class as in the case at bar, common questions are held to predominate over individual questions.

y.      Since all claims by named Plaintiffs and unnamed Class members are based on the same alleged "across the board" failures by Defendants and other unfair competition laws under the UCL, the predominance requirement needed for class action treatment is satisfied.

z.     A class action is superior to thousands of individual actions in part because of the non-exhaustive factors listed below:

    a.  Joinder of all class members would create extreme hardship and inconvenience for the affected consumers because of their immense geographical dispersion.

    b.  It is highly unlikely that individual Plaintiffs would shoulder the burden of this vast and complex litigation as many are simply too poor or uneducated about Defendants' actions to bring separate actions;

    c.  The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

    d.  Individual suits would not be cost effective.  The costs to individual Plaintiffs in a collective action are lowered through the pooling or resources and by limiting the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity; and

    e.  The action is manageable as a class action; individual lawsuits are not economically maintainable as individual actions.

Defendants have also acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory relief with respect to the Class as a whole.

### FIRST CAUSE OF ACTION

### (Fraudulent Concealment and Misrepresentation)

45.    Plaintiffs reallege and incorporate here by reference each of the foregoing paragraphs, and further allege as follows.

46.    Defendant Thumbtack concealed and made misrepresentations of material fact concerning concerning the nature of its services for Pros, including the nature and quality of the Leads – namely that the Leads were not from serious, previously vetted customers and were sent to more than a handful of Pros. Specifically, Thumbtack knew (or should have known) that its services to Pros were not of the nature that was advertised, including the nature and quality  of the  Leads.  Thumbtack concealed material facts and/or made the material misrepresentations in order the boost the sales of its programs and Leads.

47.    Thumbtack knew that Plaintiffs and Nationwide Class Members relied upon such material representations about the Leads, and omitted material information and/or made such material representations to induce Plaintiffs and members of the Nationwide Class to act, i.e. to pay in order to get access to the Leads. Moreover, to pay for the Leads, the Pros were required to provide either a checking/savings account from which Thumbtack could automatically debit all

Lead fees, or a credit card on which Thumbtack could automatically charge such fees. Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead was material to the Pros.

48.    The representations about the Leads and the omissions about the Leads were material to Plaintiffs, such that, had Plaintiffs known that the representations were false and Thumbtack had omitted material information, Plaintiffs would not have provided Thumbtack with the means to charge their credit card and/or debit their bank accounts. Plaintiffs and the class did not know the true facts, and relied upon the material representations and omissions made by Thumbtack.

49.    Plaintiffs and the members of the Nationwide Class had no way of knowing that Thumbtack's representations were false and gravely misleading, or that Thumbtack had omitted imperative details. Plaintiffs and the members of the Nationwide Class did not, and could not, unravel Thumbtack's deception on their own.

50.    Thumbtack knew its statements was false, and intended that Plaintiffs and the members of the Nationwide Class would rely upon the false representations.

51.    Thumbtack concealed and failed to disclose to Plaintiffs and members of the Nationwide Class that, despite its affirmative representations about its services, including the Leads, it would charge Plaintiffs and the members of the Nationwide Class for unqualified Leads. Thumbtack concealed these material facts with the intention that Plaintiffs and the members of the Nationwide Class would act.

52.    As a result of Thumbtack's fraudulent representations and omissions, Plaintiffs and the members of the Nationwide Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

53.    Thumbtack's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Nationwide Class's rights and well-being to enrich Thumbtack. Thumbtack's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## SECOND CAUSE OF ACTION

### (Violation of *Business and Professions Code* sections 17200, *et seq.*)

54.    Plaintiffs reallege and incorporate here by reference each of the foregoing paragraphs, and further allege as follows.

55.    Plaintiffs, pursuant to *Business and Professions Code* section 17204, bring this cause of action on behalf of themselves and as a private attorneys general.

56.    *Business and Professions Code* section 17200, *et seq*., also known as the Unfair Competition Law, defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. The Unfair Competition Law imposes strict liability.  Plaintiffs need not prove that Defendants intentionally or negligently engaged in unlawful, unfair or fraudulent business practices – but only that such practices occurred.

***"Unlawful" Prong***

57.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

58.    As detailed in Plaintiffs' Cause of Action below, the Consumer Legal Remedies Act, California *Civil Code* sections 1750 - 1784, prohibits a business from engaging in sales practices that are deceptive or misrepresentations when offering goods and services to the general public.

59.    Defendants' unlawful business practices are ongoing, and unless enjoined under *Business & Professions Code* section 17203, and/or under section 17535, are likely to continue to deceive other members of the general public at the expense of Defendants' competitors.

60.    Defendants violated Cal. Bus. & Prof. Code sections 17200, *et seq*. by engaging in unlawful, unfair, or fraudulent business acts or practices and unfair, deceptive, untrue, or misleading advertising, including:

- Falsely representing the quality and nature of the Leads;

- Misrepresenting the availability of refunds and credits, and making it difficult for Plaintiffs to get a refund on false Leads;

- Charging Plaintiffs for leads that were not qualified business opportunities and were not generated by any means to assure they were from serious potential customers;

- Concealing and misrepresenting to Plaintiffs material information about the

nature, quality and source of the leads and selling bogus leads to them;

- Refusing to refund Plaintiffs upon being provided ample evidence of the fake nature of the lead;

- Sending each lead to an undisclosed number of individuals, therefore significantly decreasing the chances of Plaintiffs obtaining a project through that lead;

- Charging Plaintiffs for leads without their knowledge or consent;

- Disregarding the parameters and limits placed by Plaintiffs on the type and number of leads to be charged for.

***"Unfair" Prong***

61.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

62.    Defendant's business practices are unfair under the UCL because Defendant has acted in a manner that is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to Plaintiffs and the Class Members. These business practices include but are not limited to falsely representing the quality and nature of the Leads, misrepresenting the availability of refunds and credits, making it difficult to get a refund on false Leads, etc. The acts engaged in by Thumbtack are fraudulent and show a pattern of untruthful statements, false representations, concealment, intent to mislead, and a conspiracy to defraud that were all part of a scheme to mislead.

63.    Further, the impact of the practice against Plaintiffs and the Class Members far outweighs any possible justification or motive on the part of Defendant. The impact on Plaintiffs and the Class Members has been described.  Defendant can have no possible justification for engaging in immoral, unethical and substantially injurious act of charging Plaintiffs and the Class Members through misleading and deceptive conduct. Furthermore, Plaintiffs and the Class Members could not have reasonably avoided this injury because they relied on Defendant's advertising as to the quality and characteristics of the services being sold, as all consumers who rely on the verity of product advertising must do. Defendant's false advertising is also violative of public policy.

64.    Thumbtack's representations and acts as set out above induced Plaintiffs and other similarly situated members of the class to pay the amounts charged by Thumbtack, allowing them to collect sums never agreed to by customers. Plaintiffs reserve the right to identify additional violations by Thumbtack as may be established through discovery.

65.    The harm to Plaintiffs and Class members outweighs the utility of Defendant's practices. There were reasonably available alternatives to further Defendants' legitimate business interests other than the misleading and deceptive conduct described herein.

***"Fraudulent" Prong***

66.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

67.    Defendant's acts and practices alleged above constitute fraudulent business acts or practices as they have deceived Plaintiffs into paying for Leads which were deceptive, bogus and not of the quality promised by Thumbtack. Defendant's acts and practices are highly likely to deceive and have deceived members of the public.

68.    Defendant's business practices, as alleged herein, also constitute fraudulent conduct because Defendant did not deliver the services it promised its Pros. Defendant's representations and omissions in California were material because they were likely to deceive reasonable consumers.

69.    Plaintiffs and Class Members did not know about Defendant's improper practices when they signed up for Defendant's website. Accordingly, Defendant should not have omitted and/or misrepresented the facts surrounding its service.

70.    Defendants omitted and misrepresented material information pertaining to its service and, among other things, convinced Plaintiffs and Class Members to purchase more of its Leads, and to otherwise ensure that Plaintiffs and Class Members would not discover Defendant's underlying fraud regarding its omissions and misrepresentations regarding its services. As a result, Defendant violated Cal. Penal Code § 502.

71.    Defendant's fraud led to Pros paying for Leads that they would not have paid for if they knew the truth about these Leads.

72.    As a direct and proximate result of Defendant's unfair, unlawful, and fraudulent acts and practices, Plaintiffs and Class Members were injured and lost money.  They did not

receive the benefit of the bargain in purchasing the Leads, and they spent their own time and money dealing with various situations that arose as a result of Defendant's practices.

73.    Defendants acted intentionally, knowingly, and maliciously in violation of California's Unfair Competition Law.

74.    Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices, declaratory relief, reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5, injunctive relief, and other appropriate equitable relief.

75.    In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiffs also seek, in addition to damages, restitution and other equitable relief, to recover attorney fees under (i) section 1021.5 of the *Code of Civil Procedure*, and/or (ii) the "common fund" doctrine available to prevailing Plaintiffs who confer a benefit on the general public.

### THIRD CAUSE OF ACTION
#### (Unjust Enrichment)

76.    Plaintiffs reallege and incorporate here by reference each of the foregoing paragraphs, and further allege as follows.

77.    As the intended and expected result of their conscious wrongdoing, Defendants profited and benefited from Plaintiffs and Class Members payments for Leads.

78.    Defendants voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of the their misconduct alleged herein, Plaintiffs and the Nationwide Class were not receiving services or Leads of the quality, nature, fitness, or value that had been  represented  by Thumbtack, and that a reasonable consumer would expect.

79.    Defendants have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiffs and the Nationwide Class, at the expense of these parties.

80.    Equity and good conscience militate against permitting the Defendants to retain these profits and benefits, and permitting the Defendants to do so would be unjust  and  inequitable because of the Defendants' misrepresentations and misconduct against Plaintiffs and members of the Nationwide Class, as alleged herein.

81.     Because the Defendants' retention of the non-gratuitous benefit conferred upon them by Plaintiffs and the members of the Nationwide Class is unjust and inequitable, the Unjust Enrichment Defendants must pay restitution to Plaintiffs and members of the Nationwide Class, as ordered by the Court.

82.     Furthermore, Defendant's conduct was willful, intentionally deceptive, and intended to cause economic injury to Plaintiffs and the Class. Defendants are therefore liable to pay punitive damages.

83.     Plaintiffs and Class Members are entitled to damages in the amount Defendant was unjustly enriched, to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Violation of California False Advertising Law)

84.     Plaintiffs reallege and incorporate here by reference each of the foregoing paragraphs, and further allege as follows.

85.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any . . . corporation. . . to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

86.     Thumbtack caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Thumbtack to be untrue and misleading.

87.     Thumbtack has violated § 17500 because its misrepresentations and omissions regarding the nature and quality of the its services, including the nature and quality of the Leads, and its policies and practices relating to Lead generation and dissemination detailed in this Complaint were material and likely to deceive a reasonable consumers.

88.     Plaintiffs suffered an injury in fact, including the loss of money or property, as a result of Thumbtack's unfair, unlawful, and/or deceptive practices. In choosing to buy Leads from Thumbtack Plaintiffs and the other class members relied on the misrepresentations and/or

omissions of Thumbtack with respect to the price they would pay, the nature and quality of the Leads sold by Thumbtack, and Thumbtack's adherence to the parameters and limits Thumbtack set for its Pros. Had Plaintiffs and the other members of the Class known the true facts, they would not have agreed to sign up for a membership or to buy Leads from Thumbtack, would not have remained Thumbtack's customers, and/or paid as much for Leads.

89. Accordingly, Plaintiffs and the other members of the Class overpaid and did not receive the benefit of their bargain.

90. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Thumbtack's business. Thumbtack's wrongful conduct is part of a pattern or generalized course of conduct that was perpetuated and repeated, both in the State of California and nationwide.

91. As a result of Defendant's misconduct pursuant to Cal. Bus. & Prof. Code § 17500, Plaintiffs and the Class are entitled to individual, representative, and public injunctive relief and any other necessary orders or judgments that will prevent Defendant from continuing with their false and deceptive advertisements and omissions; restitution that will restore the full amount of their money or property; disgorgement of Defendant's relevant profits and proceeds; and an award of costs and reasonable attorneys' fees.

## FIFTH CAUSE OF ACTION
### (Breach of Implied Contract)

92. Plaintiffs reallege and incorporate here by reference each of the foregoing paragraphs, and further allege as follows.

93. Plaintiffs and the members of the Class paid money to Thumbtack in exchange for its services, including Leads.

94. An implied contract was created between Thumbtack and the Pros whereby Thumbtack was to provide Plaintiffs and the Pros marketing tools and, Leads that were from targeted, serious, qualified and/or project-ready customers.

95. Plaintiffs and the members of the Class were charged hundreds and thousands of dollars for Leads.

96. The sale of Thumbtack's Lead services were misrepresented to Plaintiffs and the members of the Class. Furthermore, Thumbtack's Leads and Lead generation process are

---

systemically flawed, and are not comprised of targeted, serious, qualified and project-ready customers.

97.    The Leads were not of the nature and quality of the Leads that were represented and required, yet Thumbtack sent to and charged the Pros for such Leads.  Thumbtack did not generate Leads for the Pros that were targeted and from serious, qualified or project-ready homeowners. Also, Thumbtack charged Pros for Leads that have been sent to more than a handful of Pros without knowledge or consent of the Pros.  Furthermore, Thumbtack systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to Pros.  Finally, Thumbtack employed tactics that prevent Pros from cancelling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

98.    Accordingly, Thumbtack has breached the implied contract that was formed between it and Plaintiffs and members of the Class.

99.    As a result, Plaintiffs and members of the Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of the breach by Thumbtack.

## SIXTH CAUSE OF ACTION

### (Violation of the Consumer Legal Remedies Act (CLRA) – Civil Code § 1750, *et seq*.)

100.    Plaintiffs reallege and incorporate here by reference each of the foregoing paragraphs, and further allege as follows.

101.    Defendants are "persons" as defined by *Civil Code* section 1761(c).

102.    Plaintiffs are "consumers" within the meaning of *Civil Code* section 1761(d).

103.    The Consumers Legal Remedies Act applies to Defendants' conduct because it extends to transactions that are intended to or result in the sale or lease of goods or services to consumers.

104.    Defendant violated and continue to violate the CLRA by engaging in the following practices: purposely omitting information about the true nature of the Leads, and using misrepresentations to vigorously supplement leads by means that are inherently incapable of generating real, genuine leads for Plaintiffs; failing to validate the accuracy of the address, phone

number or customer name associated with a lead, and making no effort to verify that the individual identified in the lead is the customer, that the individual submitted the lead or is project-ready; automatically charging Plaintiffs' credit cards and deducting funds from their checking accounts for leads that were not properly vetted, and systematically disregarding the parameters and limits placed by Plaintiffs on the type and number of leads they agree to be charged for. Defendants intentionally and knowingly misrepresented material facts regarding their services with intent to mislead Plaintiffs and the Class.

105.  Defendants owed Plaintiffs a duty to disclose all information that was material to Plaintiffs and the Class.

106.  Defendants engaged in unfair or deceptive acts or practices when, in the course of their business, they, among other acts and practices, knowingly made materially incomplete representations or misrepresentations to Plaintiffs and the Class, and concealed facts.

107.  As detailed above, Defendants misrepresented material information to Plaintiffs and the Class regarding its services, charging Plaintiffs for leads that were not qualified business opportunities and were not generated by any means to assure they were from serious potential customers, concealing and misrepresenting to Plaintiffs and the Class material information about the nature, quality and source of the leads, selling bogus leads to Plaintiffs and the Class, and refusing to refund them upon being provided ample evidence of the fake nature of the leads, sending each lead to an undisclosed number of individuals, therefore significantly decreasing the chances of a Plaintiff obtaining a project through that lead, charging Plaintiffs and the Class for leads without their knowledge or consent, and disregarding the parameters and limits placed by Plaintiffs and the Class on the type and number of leads to be charged for.

108.  Defendants intentionally failed or refused to disclose all relevant information to its users including Plaintiffs and the Class.

109.  Defendants' conduct and deceptive omissions were intended to induce Plaintiffs and Class members to believe that they were paying for legitimate leads, and were gaining customers and work through these leads.

110.   Defendants' conduct constitutes unfair acts or practices as defined by the California Consumers Legal Remedies Act (the "CLRA").

111.   Plaintiffs and the other Class members have suffered injury in fact and actual damages resulting from Defendants' material omissions.

112.   Plaintiffs and the Class seek an order enjoining Defendants' unfair or deceptive acts or practices, equitable relief, and any other just and proper relief available under the CLRA. The claim for equitable relief is brought in the alternative should Plaintiffs not have an adequate remedy at law.

113.   Defendants have been on notice of the issues raised in this count and this Complaint by way of communications received from Plaintiffs and the Class Members. As such, Plaintiffs and the Class seek all damages and relief to which they are entitled.

## PRAYER FOR RELIEF

114.   Plaintiffs, individually and on behalf of all others similarly situated pray for relief and judgment against Defendants as follows:

(a)    An order certifying the Class and designating Plaintiffs REESE TURBIN, JENNIFER L. BROOKMAN, CHRISTI CLINGAN, JARED S. GILFORD, ERICA REESE, MAURICIO SERRANO, and MICHAEL SEYBERT as Class Representatives and their counsel as Class Counsel;

(b)    Awarding Plaintiffs and the proposed Class members actual or compensatory damages according to proof;

(c)    Awarding restitution and disgorgement of all profits and unjust enrichment that Defendants obtained from Plaintiffs and the Class members as a result of their unlawful, unfair and fraudulent business practices described herein;

(d)    Awarding declaratory and injunctive relief as permitting by law or equity to individual Plaintiffs, including enjoining Defendants from continuing the unlawful practices set forth herein, and directing Defendants to identify, with Court supervision, victims of their misconduct and pay them all money they are required to pay;

(e)     Exemplary and punitive damages sufficient to punish and deter the Defendants and others from future wrongful practices;

(f)     Pre-judgment and post-judgment interest;

(g)     Awarding attorneys' fees and costs; and

(h)     Providing such further relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury of all issues raised in this Complaint.


DATED: April 16, 2025                    **BEVERLY HILLS TRIAL ATTORNEYS, P.C.**


                                         */s/ Azar Mouzari*
                                         Azar Mouzari, Esq.
                                         Nilofar Nouri, Esq.